and we'll proceed to hear argument in the next case on calendar for argument this morning, which is 25-2618, April Fonseca v. James Barringer et al. And we will hear first from Mr. Mitten. May it please the Court, my name is Eric Mitten, Counsel for the City of Medford Defendants. I'd like to reserve three minutes for rebuttal. This case raises two separate and independent issues related to qualified immunity, either of which independently could form a basis for reversal. I'd like to first talk about the issue of whether the law was well established at the time of this police action. There's a lot of different fact patterns cited in the briefing, but for well-established law, we're supposed to look at factually similar fact patterns that would give an ordinary patrol officer reasonable notice of what the law is. And there's one case that stands head and shoulders above the rest on that issue. It's Myers v. City of New York. Decided six months before this case, it dealt with the clearing of Occupy Wall Street by the New York Police Department. There are many similarities, also a couple key distinctions in that. In that case, the mayor issued an order temporarily closing the park after about 150 people had set up tents in that public park, preventing its use for its intended purpose and raising concerns about hygiene and public safety. The NYPD came in at 1 a.m. without advance notice in riot gear. Not all of these facts are clear from the face of the opinion, but it was a high-profile issue and they are not disputed. And within 30 minutes, it arrested 150 people. With Hawthorne Park, we had a similar situation in that we had about... So in Myers, did they arrest all the people who were illegally camping? Were there other people in the park? Did they close the park, announce a closure, exclude other people? My understanding is that the park was closed to everybody. Did they let some people in selectively if they were helping in the clearance? They did not.  They did not do that. That seems to be one of the salient facts in this case, is that there's some evidence in the record that people went into the park here and then they were stopped, like, whoa, you can't go in, the park is closed. Oh, no, I'm helping out. Oh, okay, you can go in. Absolutely, and that is one of the key distinctions here. Looking at Myers, Myers... But that's true. I mean, it wasn't just like it's closed and just government employees or contractors or designated people. This was like they were not checking to see if they were from, you know, a particular group or whatever, but members of the public who just came up and said, I'm helping, they were waved in. They were, and it was still limited to people who are there to help accomplish the purpose of the closure. They weren't contractors with the government, but they were still limited to people there to help. So, any member of the public who showed up at Hawthorne Park, the officer would decide whether to let in if they said that they were going to help with the closure. So, somebody shows up, I'm going to help with the closure, you're in. Somebody else shows up, I'm here to record and, you know, write a story. You're excluded. Is that... Do I have that correct? That is how the closure works. That is correct, Your Honour. And... Why isn't that just, I mean, a facially discriminatory policy that if it's open to the general public, if you're coming in for one purpose, but if you're coming in for First Amendment activity, uh-uh? Well, I don't think it was open to the general public as a whole for... But you just said that if a member of the general public shows up and says, I'm going to help out, they were in. But if they come and say I'm going to report it, then they're out. It seems facially discriminatory between First Amendment activity and other members of the general public who are going to do the activity that you consider to be acceptable. I mean, you could have closed this park and just closed it. And said, we're only going to let in who we're going to let in. We have a contractor or the officers are going to take care of it. But that's not what happened. It was open to members of the general public to come in who were assisting, but not if they were engaged in First Amendment activity. So it seems that in the implementation, there's a facially discriminatory First Amendment problem. Well, Your Honour, I think it's still because it was limited to people who are actively helping the campers gather their stuff. I still believe it's facially neutral, because it's not discriminating against certain sorts of expressive conduct, but not others. I also think that one of the key issues --. Do you have a case in which in the implementation of that kind of limitation, it was open to members of the general public to come in and assist in that limited purpose? I mean, because the other examples that I've seen of closures appear to me that they really did a closure and they controlled who was going in in a much tighter way than this case. That's what makes this a little bit different. It is different. And if I may, just a practical thing is some of these campers may not trust individuals affiliated with the police, but they may trust a service worker with a nonprofit that's not affiliated. So it was still consistent with the purpose of the closure to allow in people besides just city contractors. Right. And you had actually identified in the implementation plan a couple of groups who would be allowed in. Yes. Because they were going to provide targeted services, get them over to shelters, et cetera. If people were, you know, fire victims from the Alameda fire, they'd go to another place. But it wasn't limited to just those people. That is correct, Your Honor. And I think on qualified immunity, the question is not so much whether it's whether that was the correct decision on how to structure it, but whether that rule was clearly unlawful. And looking at Zuccotti Park, where no assistance was given to campers, it was lawful, but it didn't feel great from a humanitarian perspective in terms of 150 people arrested to here, where by slowing it down, giving advance notice, there were some benefits. With the benefit of hindsight, I understand the concern about there's this distinction being made. But for qualified immunity, the question is whether the officers operating this plan, looking at additional humanitarian safeguards built in for the purpose of helping the campers, would have known that it takes it outside of well-established law, whether officers who approved of those safeguards were plainly incompetent or knowingly violating the law. Well, it was also a media staging area, correct? There was a media staging area. It was 60 feet closer to the center of the campground than the sidewalk. There's been some testimony that it was not a great media staging area for audio recording. It's 60 yards from the center might be great for telephoto photography, but we're not claiming with the benefit of hindsight and everything that it was the best for audio recording. But we did set up a media staging area. We did provide advance notice to reporters to at least be present to be aware of what was going on, which is not something that happened in Zuccotti Park. And in terms of resources available, we had body cams throughout the park. Ms. Fonseca in her briefing points out that we produced 28 hours of body cam of activities in the park dialogue going on within the park. So that was an additional factor not present in the Zuccotti Park clearance that would have given reporters making public records requests access to audio and video of what was going on inside the park. Well, why isn't there a factual issue about the supposed reason for the closure, given that there's a tape where one of the officers says, well, you know, something along the lines of, well, I'm glad reporters aren't here following me and recording me or something along those lines. Well, first, the individual saying that was not the, I believe that was Officer Kirkpatrick, and he was not the one in charge of the plan. Regardless, I think it has less to do with the subjective intent and more the impact on the parties involved. Subjective intent on summary judgment is always going to be a difficult thing for the city to prove. But just because inferences are viewed more in the light and most favorable of the non-moving party, but. But you look at that combined with what Judge Collins was pointing out of not allowing reporters, but allowing just random volunteers to come in. Why isn't that combined with all those, a factual issue that we can't resolve? Because if looking to the test, and Zuccotti Park assumed, but did not determine that it would be under intermediate scrutiny. And it looks at whether there's a legitimate state interest and restrictions are rationally related to that interest. It doesn't look at the subjective intent of the operators of the plan. So I recognize that those comments on a summary judgment record, if subjective intent is an element, are challenging. But I think whether you look at rational basis or intermediate scrutiny, you're looking at the plan and its impact on people in terms of the plan itself and less about the subjective intent of individual officers involved in carrying out the plan. Quickly turning to the issue of rational basis, review versus intermediate scrutiny. Looking at the cases where intermediate scrutiny is applied, those are typically cases, to summarize briefly, where members of the general public are allowed to walk around for any purpose and there's restrictions on information gathering or expressive conduct. For example, individuals in the Garcia V. Alameda case, filming street racing on a public sidewalk where anyone can walk, but the filming is restricted. Or in the Atkins v. Department of Homeland Security, a sidewalk where anyone can walk their dog back and forth, but filming of federal agents on an adjoining private property is restricted. This was a property that was closed to the public. And Ms. Fonseca, when she was arrested, said, I'm still allowed in because I'm a reporter. Didn't say, oh, the park is open today. One key case, getting to the court's previous concern about, well, some people are allowed in, is Pell v. Precunier. I'm not sure if I'm pronouncing that right, but that dealt with a prison where reporters were restricted in how they could interview inmates, and they were restricted to a greater degree than family members. It's different about Pell. Is the class of people who are allowed to have the one-on-one contact with the inmates was defined by a pre-existing relationship. So it's like family members, attorneys, et cetera. So it's not just anyone who shows up and says that they're there for a particular purpose. It's a predefined relationship. So that seems distinguishable from this case. It is a predefined relationship. I would argue in our case that it was still limited by a specific purpose. It's less about the individual's identity and more about the individual's purpose. So it's still a set of limited stakeholders and not the general public as a whole for general public purposes. I see that I'm at the three-minute mark. If there's no further questions, I'd like to reserve the rest of my time for rebuttal. All right. Thank you, counsel. We'll hear next from Mr. Powell. Good morning, Your Honour, and may it please the court. Bill Powell here on behalf of Plaintiff April Fonseca. Ms. Fonseca is an award-winning radio journalist and she joins us here in the courtroom this morning. While she was reporting on a newsworthy event in a public park, defendants abruptly arrested her and seized her recording equipment. In doing so, they violated her clearly established right to record the police when engaged in their official duties in public. That right has been clearly established in this circuit for more than 30 years. Accordingly, defendants are not entitled to qualified immunity. Because this speech... But, I mean, you agree that the law does say that you can sometimes close a park completely if you, you know, you have to do maintenance, you have to do some kind of operation there, and you can just completely close the park, correct? I would agree that you can close a park in a situation where you have a reason to do so and that you've shown that reason. But here, under intermediate scrutiny, the district court held that there were key factual disputes about the extent to which the defendants could show that they had any significant interest in closing the park or that they had left open any alternative adequate means. And then even setting that aside to the point... ..even assuming they were allowed to completely close the park. Here, they did so only on a discriminatory basis. They sort of reverse-tailored the closure to restrict First Amendment activity to the greatest extent possible while allowing other types of activity in the park. So what's the case that you think most clearly is on point that would tell an officer such that, in light of that case, every reasonable officer would understand that this was unconstitutional? I would give you two cases, Your Honour. The first is the Fordyce case, the Fordyce v. Seattle. That case was from 1995, so it was clearly established long before the events that occurred here. In that case, there was a protest going on in the city of Seattle, and the police were controlling the protest, but the plaintiff was a public TV reporter, and he was videoing the police officers, and they seized his recording equipment, and the Ninth Circuit held that that violated his right to record the police, even though it was occurring in a situation... Do you have a closure order at issue in that case? My understanding is that there were dispersal orders going on for the protest, but maybe less of a geographic one. So let me turn to the second case that I was going to mention, which is the Reid case. In that case, it concerned Yellowstone Park, and there was a herding of buffalo going on in Yellowstone Park, and the officers there tried to close off a certain route that would allow them to move the buffalo. But the person who wanted to observe was doing so on a kind of pull-off along that route, and this court held that there were key factual disputes about whether they actually had an interest in preventing that person from being in the location that they were, and reversed the district court's grant of judgment, notwithstanding the verdict to the defendants in that case. So I think that case clearly established that even where you're closing off an area, you still have to tailor that to allow, to the extent possible, someone who's just observing to record. So what is it precisely that's unconstitutional? Is it the initial, the park closure order itself? Is it the implementation document that gives instructions for how it will be carried out? Or is it the actual conduct on the ground by the officers sorting people who could go in and go out? Because there's sort of three different things there that produce this outcome. Which of those is the one that's unconstitutional, and unconstitutional in your view, clearly under Reed or other cases? Sure. So I think each one of those steps was clearly unconstitutional under this court's precedent, but it was a course of conduct. Well, the closure order, just on its face, is a total closure. I mean, it just says the park is closed. And if they had just closed the park and really let no one in other than officers who were going in to clear people out and who were disobeying the closure order, this would be a very different case, wouldn't it? I agree that would be different. So let me maybe try it in two different steps. So the first is that when closing a park like this, I read this court's precedents to require tailoring and to consider the rights of people who might want to observe and to tailor the closure to allow observing to the extent possible. Even if they decide, you know, we're just going to, this is a, at some level, this is a law enforcement operation in part. It's humanitarian, but it's partly law enforcement. The people in the park are camping in violation of the law and they're not getting out. And you're saying that even if they say, we're just going to close the park for, say, three hours. I mean, I know it was longer, but we're just going to close it for three hours. No one's in. We're just going to send the cops in to clear out people who are violating the law. Even then there has to be a press right. They just can't close the park, say this is a law enforcement operation and that's it. So I think our position is actually fairly modest, which is just that they have to consider the First Amendment interest and tailor to that First Amendment interest. But there are many situations, I think, in which the police will be able to fully exclude the press and can do so consistent with intermediate scrutiny, which I don't think is a straitjacket at all in this context. So for instance, let's say there's a crash on the side of the highway and cars are, you know, abutting out into the lane and cars are flying by at 75 miles an hour. I think the police in that situation easily can satisfy your immediate scrutiny to just say, no, it's not safe to have anybody here. No press access whatsoever. I think you could have a situation, maybe the Zuccotti Park one. I mean, that's an unpublished, out of circuit precedent. So the fact that that is my friend's best case, I think, suggests that there aren't a lot of good cases for him. But even taking that case on its own terms, there may be a situation where the park is just such a mess, maybe there's violence going on or something, where, sure, you're going to be able to close it entirely to clear it. But I think you do, because of the right of, that I think any reasonable officer would understand, a right to record the police when they're engaged in their public duties in public or their official duties in public, pardon me, that you have to at least consider whether there's an option to allow observation. And here there was none of that. But even, oh, go ahead. So here, if they didn't allow anybody, they only allow, they didn't allow volunteers to come in. They didn't allow reporters and said, they said only people we've deputized, we've hired and vetted to help clear out and assist the police. Would that closure have been okay? So I think our position is that that closure probably, they would still have to meet intermediate scrutiny and maybe they would be able to. But what we have here is a much different case. It's harder to say that that was clearly established, that you couldn't do that. I mean, I think especially the cases that are more in the right of access line suggest that, you know, the in-press enterprise too, the closure of the murder trial, that was as to everyone. It wasn't that they let in some people to the murder trial and not to others. But still, they had to meet essentially intermediate scrutiny there, the Supreme Court said, in order to justify that exclusion. But even if you disagree with what I'm saying about a closure order that is non-discriminatory, I think what's very important here is that the closure order was discriminatory. So what they actually did was that they allowed in anyone who wanted to help out. And there were a few different categories of folks who were in the park. There was the kind of service providers who they had mentioned in the operation plan, yes. But there were also, as you've mentioned earlier, just some folks who showed up and said, you know, I'm here to help the homeless basically. And they said, well, just go pick up a trash bag and you can stay. You can see that on the body cam footage. There were also a group of, I don't know exactly what the right word is for them, advocates or community organizers who had sort of been coordinating with the campers. On the body cam footage from the day before, you can see them. They were getting into some arguments in particular with Officer Kirkpatrick. And those folks were in the park that morning. They didn't ask them to leave or to move in any way. And to the extent anyone was obstructing the police, they were probably the ones. In addition, although they created the media staging area here, there are the two videos I would suggest looking at. It's KFORI Declaration Exhibit 2 and 3, the CBS and NBC footage. You just can't see anything from the media staging area. You can see some trees. You can't hear what's going on with the clearance. You can't see what's going on with the clearance. It was not in the terms of intermediate scrutiny an adequate alternative place from which to observe what was going on. And crucially, the district court found material factual disputes with respect to alternative adequate avenue for observation and with respect to whether there actually was any kind of extenuating emergency here that required excluding journalists from the park. And this court lacks jurisdiction in this intermediate posture where there is a sufficiency of the evidence issue to review those questions. I would like to turn very briefly to that Myers case that he mentioned. I haven't had a chance to address that directly. So there were no observers at issue in that case. The plaintiffs were themselves the campers, the ones who had occupied the park. And they said we had a First Amendment right basically to obstruct the police and to continue to occupy the park. And the Second Circuit in that case, I think helpfully for us, did apply intermediate scrutiny to that park closure. So that's another example of one where they were doing a complete closure and still the court applied intermediate scrutiny. It's just that there they held, yes, you can satisfy intermediate scrutiny because with respect to the campers' rights in particular, these folks had been obstructing the park and there was a compelling government interest in removing their campsites from the park and allowing the park to be freed up for other purposes. Here, though, we're talking about a separate observer, a journalist, who as it is for court observed, you know, there really was not any immediate threat to anyone in the park. That morning, one of the defendants, City Manager Sijothan, he was standing in the park drinking coffee. It was a sunny morning. Folks were, I think actually an irony here, is that if they had not arrested my client, I think they were probably going to get pretty good press because they actually were working with the campers pretty productively. Folks were picking up. There was a mess, but they were picking up and moving out. They had been there the day before with a resource fair, working very collaboratively with the campers to clear the park. And so overall, I think, you know, the actual, with respect to the campers, what they were doing made a lot of sense. It's just that all they needed to do was allow a little bit more observation, tailor it in a slightly different way, maybe move that media staging area to the other side of where the camp was, where there weren't trees in the way. Even if it was a little further away on the sidewalk, I think it'd be better that you could at least see what was going on. And maybe with Ms. Fonseca, allow her to record some audio. So an officer deciding, you know, whether or not to make an arrest for someone who is staying in the park after being instructed to leave is supposed to be thinking, well, gee, they didn't really tailor the staging areas in the wrong place, and therefore it's not tailored and it's clearly established. I mean, is that what they're supposed to be thinking? What is it that tells the other? Because we ultimately don't have the validity of the policy directly in front of us in this case, because it comes to us in this interlocutory posture. And you've got a claim against the city where the qualified immunity overlay doesn't apply, but we don't have that in front of us. So what is it that tells the officers who are making the line decisions and who made the line decision in this case that you can't do this? So I'd like to say maybe three things in response to that, Your Honor. The first is that I really think under this court's precedent, the one thing that all the officers on the scene here should know is that there is a right of the public to record police when they're engaged in their official duties in public. And this court has held that repeatedly. And I think we have some evidence here. I understood that, but the question is, where can you do that? Does that give you a right of access into a place that has been declared closed? Right. So I think the defendants here have not tried to draw fine distinctions between the different defendants and sort of what they knew about what they'd been told and things of that nature. But I would point out in particular a couple of the defendants, because I think it's relevant to answering your question. Defendants Jewell and Kirkpatrick and then also defendant Arnold, they were the ones who selected the media staging area and they were also the ones who gave the morning briefing. And at that morning briefing, they instructed the officers to target journalists in particular for arrest. They're also the officers Jewell and Kirkpatrick were the ones who the day before were caught on their body cam saying the best part about this closure tomorrow is that they can't follow us around and they used a couple expletives. They can't follow us around sticking cameras in our faces. And then the morning of the enclosure, as those two Jewell and Kirkpatrick are driving up, they say before they get out of the car, not the public's got to leave, everybody's got to leave. They say media's got to leave, observers got to leave. And so I think those officers, it's an objective test, of course, but I think given those officers were in the process of choosing the staging area, thinking about how they were going to conduct this operation, they should have, any reasonable officer in that circumstance would have understood they weren't allowed to just single out the press for this kind of enforcement. But they weren't the ones who made the actual arrest here. That is true. So then turning to defendants first, Barringer and Todd, they're the ones who actually did the arrest. It is true that they heard at the morning briefing that they could target journalists for arrest if they were outside the media staging area. But the other thing they heard at the morning briefing was that they had discretion. They said, use your best discretion. What we want to do is productively get this encampment cleared. And so I think in the moment, again, any reasonable officer knows there's a right to record the police, see a radio reporter quietly observing, not bothering anyone, that they would have exercised in that kind of circumstance discretion not to target them for immediate arrest. And Officer First, his body cam footage in particular, arrives on the scene. He's kind of raring to go to try to stop speech. And within 30 seconds of encountering Ms. Fonseca, he's got her arm twisted behind her back. What does the record show about which officers were the ones who were waving in people who said, I'm here to help, and they say, take a trash bag, et cetera? So I think it's, I don't want to overstate what's in the record on this. I'm just wondering, maybe it doesn't say who said that, you know, it's been acknowledged that there were officers who were doing that. I'm just wondering what the record says about which officers did that. Right, so it's on the body cam footage of the officers who were physically present on the park. But I'm not entirely certain, in part because one of them is like a conversation about something the officers had said to someone earlier, and they're like recounting, oh yeah, I told that guy he could pick up a trash bag. So I don't want to say in particular, but I think it was the same group that was the ones conducting the arrest. Okay. All right. Thank you, Counsel. Thank you, Your Honor. We'll hear rebuttal. Thank you, Your Honors. Just a few brief points I'd like to make in rebuttal. First, there seems to be an agreement that if we close the park to literally everyone, it would have passed constitutional muster. And whether this was the right way to handle it is a question for the entity, not the individual defendants. We were on uncharted territory in terms of how to structure this. I mean, he said that basically was his best case. Absolutely. The Reid case, if you dig into it, the particular road that the individual was parked on was not part of the closure area. There were specific roads that were closed for the Buffalo to pass. This was a side road that was not part of the closure area. So that's factually distinguishable enough that I don't think any reasonable officer, even if they knew that case was out there, would be able to apply that to the situation we've got here, where there's a specific closure area and we have individuals within that specific closure area. The other case that counsel pointed to, the Fordyce case, all officers in that case were actually granted qualified immunity with the exception of one who, instead of just enforcing the no recording restriction, slammed the smartphone of the person making recording into their face. That was the denial of qualified immunity. The officers who were simply enforcing it were protected by qualified immunity in that. So I don't think that that case outweighs the Myers case in terms of what a reasonable officer would know we're allowed to do and not to do. And in the Myers case, I absolutely recognize that the attempts to build more concessions to help out the campers made it distinguishable and it took us into somewhat uncharted territory. But if officers can't iterate to try and make things better, this was no worse for anybody than Myers. Nobody was allowed in in Myers. So the media didn't have worse access to this park than they did in Myers. Some people besides media had better access. If that was the wrong decision, that's for the entity defendant. For the officers, trying something new to improve the situation for people is what qualified immunity is supposed to protect. But going back to Reed, why isn't there, under the viewing the evidence and the light most favorable to the plaintiff, why isn't there an issue of pretext that then would make Reed controlling and clearly establish law? Because it ultimately rests on a pretext holding. And why don't we have a triable issue of that here? Because I think here there's no question that the rule was being enforced as drafted. Someone who wanted to play ball in the park would have been arrested for trespass. There's no question there that people who were not helping out with helping the campers pack their stuff and leave. But it's clear that the planners of this knew that they were going to exclude the press. Intended to exclude the press, officers expressed happiness that the press would be excluded and then the press was then selectively excluded on the day of it. So why isn't that enough for pretext? And Reed, it's been on the books and is clearly established then. Because I still think that the distinction with Reed where the individual was not even in the closure area makes the pretext discussion much more key here. And here there were body cams. There was a staging area, albeit not a perfect one with hindsight. Um, that I don't think the subjective comments of individual officers takes us outside of the objective of the plan. I see I'm well over time. Okay, all right. Thank you, counsel. The case just are going to be submitted and we thank counsel on both sides for your helpful.
judges: COLLINS, LEE, Fitzwater